62 U.S. 463 (1858)
21 How. 463
JAMES C. CONVERSE, ADMINISTRATOR OF PHILIP GREELY, DECEASED, PLAINTIFF IN ERROR,
v.
THE UNITED STATES.
Supreme Court of United States.

*464 It was argued by Mr. Russell and Mr. Cushing for the plaintiff in error, and submitted by Mr. Stanton on a brief by Mr. Black (Attorney General) for the United States.
Mr. Chief Justice TANEY delivered the opinion of the court.
This is a writ of error to the Circuit Court of the United States for the district of Massachusetts.
The pleadings and facts in the case, and the points in controversy, are briefly yet clearly stated in the exception and opinion of the court, as set forth in the transcript, in the following words:
"Be it remembered, that at a term of the Circuit Court of the United States, holden at Boston, within and for the district of Massachusetts, on the 15th day of May, 1857, by the Honorable Benjamin R. Curtis, circuit judge, and the Honorable Peleg Sprague, district judge, came the United States of America, and by an action of assumpsit declared against James C. *465 Converse, of Boston, in said district, as he is administrator of the goods and estate of Philip Greely, jun., late of said Boston, deceased, and late collector of customs at said Boston, in said district, as by the writ and declaration of record will appear; to which the defendant pleaded the general issue, and filed certain claims in set-off, as by said set-off of record will appear; and the plaintiffs joined in said issue, and thereupon said cause came on for trial before the said Circuit Court, at said May term, before a jury empannelled for that purpose, and the said defendant then and there claimed to be allowed, among other things, in set-off against the plaintiffs' claim, the sum of seventeen thousand six hundred and eighty-four dollars and ninety-two cents, ($17,684.92,) as commissions due him from the plaintiffs upon certain contracts, purchases, and disbursements, made by him for oil and other articles for the light-house service of the United States, under direction of the Secretary of the Treasury.
"At the trial it appeared by the transcript from the Treasury Department of the plaintiffs, introduced by them in evidence, that said claims had been duly and properly presented by the defendant's intestate, Mr. Greely, at the Treasury Department, for credit and allowance, and had there been disallowed, and no objection was made by the plaintiffs to the defendant's right to recover of the plaintiffs upon this ground.
"It also appeared that the defendant's intestate, as collector, had, during each year he was collector, received the compensation of six thousand dollars, and also the sum of four hundred dollars allowed by law.
"No question was made as to the amount of commissions claimed. The plaintiffs, in their transcripts, admit that the sum of $17,684.92 is two and a half per cent. commission upon the defendant's disbursements for light-house purposes during his term of office, and no objection was made that that is not the proper commission, if the defendant is entitled to any.
"It was further admitted that the defendant was from May 1st, 1849, to April 1st, 1853, superintendent of lights and disbursing agent for the district of Boston.
"The duties of this office, it was offered to prove, were the *466 charge and superintendence of all light-houses between Eastham and Plum Island, Newburyport, including the making of all necessary disbursements for the payment of the keepers' salaries, wages of men, repairs, and the necessary supplies, in the same manner as other superintendents and disbursing agents in their respective districts.
"The defendant then offered to prove the following facts in regard to these disbursements upon which the aforesaid commission was claimed.
"The Secretary of the Treasury, or the proper officer under him, during the whole term of the defendant's office, was accustomed from time to time to send specific orders to him to advertise for proposals, make contracts for and purchase all the oil, lamps, wicks, and supplies of every kind, required for the whole light-house service of the United States, as well that of the sea coasts as the lakes and rivers.
"Agreeably to such orders or requests, the defendant did, from time to time, make all these contracts and purchases, draw the necessary contracts, and all payments and disbursements thereunder and therefor, take charge of the property when purchased, and distributed the same in such quantities and to such points, all over the United States, as were required or directed by the Treasury Department. These services involved much time, labor, and responsibility, on the part of the defendant, and were performed at the request and upon the order of the Treasury Department. The defendant paid out no moneys which have not been allowed.
"And it was upon all disbursements thus made that he claimed the aforesaid two and a half per cent. commissions, amounting to $17,684.92.
"The plaintiffs objected to this evidence, because they said, admitting all that was thus proposed to be proved, it gave the defendant no claim whatever to the commissions claimed.
"The court thereupon, after consideration, ruled and decided that, admitting all that the defendant thus offered to prove to be true and as alleged, yet the defendant had no rightful claim against the plaintiffs to the said commissions, or any part thereof, and could not recover the same in set-off, but that the defendant, *467 being the collector of customs, and, as such, having received the aforesaid compensation of $6,000 and of $400 each year, could not recover any sum whatever for the commissions claimed as aforesaid; and the court thereupon refused to admit the evidence offered, and instructed the jury, in accordance with said ruling, and for the reasons therein stated, that the defendant could not recover for said commission.
"To which ruling, decision, and instruction, the defendant then and there excepted."
The question to be decided on this exception is undoubtedly one of some difficulty. But the difficulty arises not so much from ambiguity of language in any one of the acts of Congress, as from the great number of acts passed from time to time on this subject, which have been referred to in the argument. They, for the most part, differ in language in some degree from one another, and are generally introduced in some clause or proviso of the usual annual appropriation law, or an appropriation to provide for previous expenditures, and yet all bear, with more or less force, on the question before us.
The acts referred to are: 1822, 3 Stat., 696; 1839, 3 Stat., 439; 1841, 5 Stat., 432; 1842, 5 Stat., 510; 1845, 5 Stat., 736; 1848, 9 Stat., 297; 1849, 9 Stat., 365, 367; 1850, 9 Stat., 504, 542, 543; 1851, 9 Stat., 629; 1852, 10 Stat., 97, 100; 1852, 10 Stat., 119, 120.
It is obvious, therefore, that in order to carry into execution the intention of the legislative department of the Government, these various laws on the same subject-matter must be taken together and construed in connection with each other. And we should defeat instead of carrying into execution the will of the law-making power, if we selected one or two of these acts, and founded our judgment upon the language they contained, without comparing and considering them in association with other laws passed upon the same subject.
It would extend this opinion to an unreasonable length, to quote at large the language of the various acts and provisos above mentioned; nor indeed do we deem it necessary, because the object and policy of this whole legislation, when taken together, will be made evident by looking to the state *468 of the law before and at the time the different laws were passed, and the defects which then existed, and which they were intended to remedy. A particular reference to a few of them, in chronological order, will be sufficient for this purpose, and we shall refer to those which have been mainly relied on by the Circuit Court, or by the counsel for the United States, in order to support the judgment of the court below.
The first law upon this subject is the act of May 7, 1822, section 18, which provides that "no collector, surveyor, or naval officer, shall ever receive more than $400 annually, exclusive of his compensation as collector, surveyor, or naval officer, and the fines and forfeitures allowed by law for any service he may render in any other office or capacity."
At the time this law was passed, the collectors, surveyors, and naval officers, were, in certain contingencies mentioned in the act of March 2, 1799, required to do the duties of the offices of each other; and, without any special law upon the subject, it was the settled practice and usage of the Government to require collectors to superintend lights and light-houses in their respective districts, and to disburse money for marine hospitals and the revenue-cutter service; for which, by the practice and regulations of the Treasury Department, they were allowed certain commissions. But there was no act of Congress imposing these duties on the collector, or fixing his commissions for these services and disbursements. They were charged as extra services  that is, as not belonging to the office of collector, and the amount of his compensation depended altogether upon the discretion of the Secretary of the Treasury for the time being. These extra allowances in some instances amounted to very large sums; and it appears that the attention of Congress was at length attracted to this subject, and it was deemed right, and more consistent with the nature and character of our institutions, to fix by law the compensation for these services, and not leave it in every case to depend upon the discretion of the Secretary, and the act of 1822 was accordingly passed for that purpose, and for that purpose only. The language is clear, precise, and appropriate, and no multiplication of words could more plainly indicate its *469 object. The words "any other office" were evidently used with reference to the contingencies in which one of these officers might be required to perform the duties imposed by law on one of the others. And the words "or other capacity" were equally essential, in order to embrace the extra allowances made for the agency of which we have spoken, as they were not the duties of an office created by law, but a mere agency of one of the departments of the Government. The law does not forbid compensation for extra services which have no affinity or connection with the duties of the office he holds. On the contrary, it recognises his right, and gives the collector or other of these revenue officers an additional sum, over and above their salaries as officers, for extra services rendered as agents, which had no legal connection with their respective offices.
The duties for which this certain compensation was fixed were well known in the usages and practice of the Government, and Congress could therefore act advisedly and with knowledge, and judge what amount of money would be a fair compensation. But it will hardly be supposed that Congress, by this law, intended to fix this amount for every unforeseen and possible service, or the duties of every possible office which one of these revenue officers should be directed or requested by the Secretary in some emergency to fill; for, as Congress could not foresee what might be the character and importance of such a duty, there was no basis on which a judgment of its value could be formed. Nor can it be supposed that they intended to regulate in advance its compensation or value without some data to act upon.
Besides, no other salaried officer is mentioned in this law but collectors, surveyors, and naval officers; and it would hardly be just to the legislative body to impute to it the design of dealing more harshly with these revenue officers than any other officers of the Government who have certain salaries, or to suppose they would deny to them compensation in cases where every other salaried officer was allowed to claim and receive it.
We have dwelt more particularly on this act of Congress, *470 because the principles and policy on which it was passed form the basis of all the subsequent legislation on this subject, and will be found, with some modification, in every law. The great object has been to establish, by law, the compensation for public services, whether in offices or agencies, where the nature and character of the duties to be performed were sufficiently known and definite to enable Congress to form an estimate of its value, and not leave it to the discretion of the head of an executive department.
After this act of 1822, there is no act of Congress bearing upon the question until 1839. In the mean time, about the year 1833, and subsequently to that time, several cases came before the Supreme Court, in which officers who were not named in the act of 1822, but who received a fixed salary as a clerk in a department, or a fixed compensation as an officer in the army, or in some other office, claimed the right to set off against the United States compensation for extra services undertaken by the direction of the Secretary, and for which there was no fixed compensation by law. And in these cases this court held that such compensation might be claimed and set off under the act of Congress allowing set-offs against the United States; and that, where the extra service had been required by the head of the proper department, the officer was entitled to a reasonable compensation, to be allowed by the jury upon the evidence, even if there was no law expressly requiring the service or fixing compensation for it; and that it might be ascertained and allowed by the jury in proper cases, under the direction of the court, even if the head of the department had fixed no compensation, and refused to allow the claim.
Under these decisions, claims of this description were frequently made, and the United States involved in inconvenient controversies in court. These controversies again attracted the attention of Congress to the subject of compensation for extra services; and in 1839 they passed an act, embracing all persons holding office with a fixed salary, precisely similar in its principles with the act in relation to custom-house officers  that is to say, they took away from the heads of departments, *471 and from courts and juries, the right to fix the compensation in any case where it was not fixed by law; and if there was no law ascertaining the compensation or allowance for the particular service, the party was entitled to none. It carries out the principle and policy of the act of 1822, and provides that there shall be no compensation in addition to the salary, "unless said extra allowance or compensation be authorized by law."
Nor does the act of August 23, 1842, (5 Stat., 510,) go further than the act of 1839, except only in declaring that, in order to entitle the party to demand compensation, it must not only be fixed by law, but that the law appropriating it shall explicitly set forth that it is for such additional pay, extra allowance, or compensation. Now, these words, added to the provisions in the act of 1839, only show that the Legislature contemplated duties imposed by superior authority upon the officer as a part of his duty, and which the superior authority had in the emergency a right to impose, and the officer was bound to obey, although they were extra and additional to what had previously been required. But they can by no fair interpretation be held to embrace an employment which has no affinity or connection, either in its character or by law or usage, with the line of his official duty, and where the service to be performed is of a different character and for a different place, and the amount of compensation regulated by law.
This provision is introduced in the annual appropriation law for the support of the army and Military Academy. And although the words are general, and undoubtedly include officers in every branch of the public service, yet, from the general character and objects of this law, it is manifest that the attention of Congress must have been mainly directed to officers in the military service, who, from the position in which unforeseen events often place them, are called upon and required to perform duties not specified by law or regulation, but which grow out of, and are associated with, military service.
We pass on to the acts of 1848 and 1849, which are the more important because they were passed about the time this collector came into office, and apply particularly to the revenue *472 officers of which we are speaking. The clauses which bear upon this question in each of these laws is inserted in the annual civil and diplomatic appropriation law, by way of proviso to the clause making appropriations to the maintenance of the light-house service. The act of 1848 appropriates $11,640.35, being a commission of two and a half per cent. on the whole amount appropriated for that service, with a proviso that no part of the sum thereby appropriated should be paid to any person who received a salary as an officer of the customs; and that from and after the 1st day of July, 1849, the disbursements should be made by the collector of the customs, without compensation. And if this law still remained in force, it is very clear that the agency of which we are speaking would not have been authorized by law, and the set-off claimed by the plaintiff in error could not be allowed.
But this proviso in the act of 1848 is recited at large in the appropriation of 1849, and repealed without any saving or qualification; and this repealing clause is immediately preceded by an appropriation for superintendents' commissions of $11,673.25, being two and a half per cent. on the whole amount appropriated for light-house purposes. There is no restriction in these commissions in relation to revenue officers. The commissions are to be paid on the whole amount, without any reference to the person or officer who performs the service; consequently, under this law the revenue officer who performed this duty within his own district was entitled to two and a half per cent. commission on the amount disbursed; and previous acts of Congress restricting this allowance were repugnant to this law, and thereby repealed. The repeal of the act of 1848 could not, upon any sound principle of law, revive any previous act which was repugnant to the provisions contained in the repealing act of 1849. And this act allowed the commission of two and a half per cent. in all cases, and appropriated the money to pay it, leaving it to the Secretary of the Treasury to select as agent each collector for his collection district, or any other agent that he might deem more suitable for the trust.
The act of September 28th, 1850, however, restored the provisions contained in the first act referred to  that is, the act of *473 1822  and provides that no collector shall receive for his services as superintendent of light-houses over the sum of $400 per annum. But this act was followed by the civil and diplomatic appropriation law, passed at the same session, September 30th, 1850, only two days after the law above mentioned, in which the compensation is again modified in amount, and collectors whose salary exceeds twenty-five hundred dollars can receive no compensation as superintendent of lights or disbursing agent. Yet this law, like the preceding appropriation laws, appropriates a sum equal to two and a half per cent. commission upon the whole amount appropriated for light-house service, and the Secretary might therefore employ any agent he pleased; and if he was not the collector, he would be entitled to full commissions. The same provisions are contained in the appropriation acts of 1851, (9 Stat., 608,) 1852, (10 Stat., 86,) and 1853, (10 Stat., 200.)
It will be seen, from this history of the complicated legislation on this subject, that, however varying the provisions may be in some particulars, they are yet all founded on the principles and policy of the acts of 1822 and 1839, and that all of the provisos respecting the commissions to a revenue officer are confined to his collection district, and its extra customary duties therein as agent.
The just and fair inference from these acts of Congress, taken together, is, that no discretion is left to the head of a department to allow an officer who has a fixed compensation any credit beyond his salary, unless the service he has performed is required by existing laws, and the remuneration for them fixed by law. It was undoubtedly within the power of the department to order this collector, and every other collector in the Union, to purchase the articles required for light-house purposes in their respective districts, and to make the necessary disbursements therefor. And for such services he would be entitled to no compensation beyond his salary as collector, if that salary exceeded $2,500.
But the Secretary was not bound to intrust this service to the several collectors. He had a right, if he supposed the public interest required it, to have the whole service performed by *474 a single agent; for while the law authorizes him to exact this service from the several collectors, it at the same time evidently authorizes him to commit the whole to an agent or agents other than the collectors, by regulating the commission which an agent shall receive, and appropriating money for payment of commissions of two and a half per cent. upon the whole amount authorized to be expended in this service. And as the collectors would by law be entitled in some cases to nothing, and in others to the small sum above mentioned, if the service was performed by them in their respective districts, it is very clear, from the commissions allowed, and the appropriation to pay them, that he was at liberty to employ a different agency, and pay the commissions given by the law whenever he supposed the public would be better served by this arrangement.
And the case as assumed in the record is precisely that case. The Secretary had no right, under the laws upon this subject, to order this or any other collector to perform this duty for all the light-house and collection districts. The law has divided it among them, and the executive department had no right to impose it upon one. But he had a right, as we have said, to employ an agent, instead of the collector or collectors of the several districts; and if he did employ one, the law fixed the compensation, and appropriated the money to pay it. He was not forbidden to employ a revenue officer for this purpose; and, so far as his services were performed for other districts, he stood in the same relation to the Government as any other agent. The law forbidding compensation, or reducing it to a small amount, did not apply to this service. The agency was entirely foreign to his official duties, and far beyond the limits of the district to which the law confined his official duties and power. And as the department appointed him to perform a duty required by law, for which the compensation was fixed by law, and the money appropriated to pay it, he is entitled to the compensation given by law, if he has performed the duty; for the Secretary has no more discretionary power to withhold what the law gives, than he has to give what the law does not authorize. The *475 agency and services performed in this instance had no more connection with his official duties and position than the purchase of a supply of shoes for the troops in Mexico, in the late war, would have been, in the absence of any other person authorized to make such a purchase. And if such a duty was requested or required of him by the head of the proper department, and performed, nobody would deny his right to compensation, if the law authorized and required the service to be done, and fixed the compensation for it.
Upon the case, therefore, as the plaintiff in error offered to prove it, we think the court erred in refusing to admit the testimony.
Undoubtedly, Congress have the power to prohibit the Secretary from demanding or receiving of a public officer any service in any other-office or capacity, and to prohibit the same person from accepting or executing the duties of any agency for the Government, of any description, while he is in office, and to deny compensation altogether, if the officer chooses to perform the services; or they may require an officer holding an office with a certain salary, however small, to perform any duty directed by the head of the department, however onerous or hazardous, without additional compensation. But the legislative department of the Government have never acted upon such principles, nor is there any law which looks to such a policy, or to such unlimited power in the head of an executive department over its subordinate officers.
No explanation is given of the principle upon which the four hundred dollars additional compensation was allowed. If the services were regarded as extra and additional, and within the prohibition of the law, then he was not entitled to this additional allowance, because his salary exceeded twenty-five hundred dollars, and nothing more than the salary fixed ought to have been allowed him. But if they were not within the prohibition, but for services in a different agency, then he was entitled, not merely to four hundred dollars, but to the commissions fixed by law. This sum could not have been allowed for supplies in his own district, excluding those for other districts, because, as regards his own district, there is an express prohibition *476 as above stated. We, however, express no opinion upon that particular item; and whether it is a proper allowance or not, must be determined by the Circuit Court, when it hears the evidence at the trial.
For the reasons above stated, the judgment of the Circuit Court must be reversed.
Mr. Justice CATRON, Mr. Justice GRIER, and Mr. Justice CAMPBELL, dissented.
Mr. Justice CAMPBELL dissenting.
I dissent from the opinion and judgment of the court in this case. The opinion of the presiding judge of the Circuit Court, in my judgment, contains an exact exposition of the law of the case. Justices Catron and Grier authorize me to say they concur in this dissent, and we adopt that opinion as our opinion, which is in the following words:
This is an action for money had and received to the use of the United States, by Philip Greely, jun., the defendant's intestate, while collector of the customs for the port of Boston and Charlestown.
A number of items were in question when the case was opened, but in the progress of the trial all were disposed of to the satisfaction of both parties, save a charge made by the intestate, of $17,968.92, as commissions on disbursements made by him under the orders of the Secretary of the Treasury, in the purchase of oil and other materials for light-houses. The question is, whether the collector was entitled, by law, to make this charge against the United States for that service. Mr. Greely held the office of collector from May 1, 1849, to May 1, 1853.
By the act of March 3, 1841, sec. 5, (5 Stat. at L., 432,) it was enacted, that "no collector shall, on any pretence whatever, hereafter receive, hold, or retain for himself, in the aggregate, more than six thousand dollars per year, including all commissions for duties, and all fees for storage, or fees or emoluments, or any other commissions, or salaries, which are now allowed by law."
*477 The act of August 23, 1842, sec. 2, (5 Stat. at L., 510,) is as follows: "That no officer in any branch of the public service, or any other person, whose salary, pay, or emoluments, is or are fixed by law or regulations, shall receive any additional pay, extra allowance, or compensation, in any form whatever, for the disbursement of public money, or for any other service or duty whatsoever, unless the same shall be authorized by law, and the appropriation therefor explicitly set forth, that it is for such additional pay, extra allowance, or compensation."
It being admitted that Mr. Greely was an officer whose salary, pay, or emoluments, was or were fixed by the law, and that he had received its full amount of six thousand dollars, independent of the charge in question, it is incumbent on the defendant to show, not only that the service was authorized by law, but also that the appropriation for that service explicitly sets forth that it is for such additional pay, extra allowance, or compensation. It is not enough to find an act of Congress authorizing a service, and making an appropriation to pay for it. This would be sufficient, provided the person rendering the service were not an officer, or other person, entitled to a fixed compensation. If he be, and he claims an extra compensation for an extra service, he must produce an appropriation which explicitly sets forth that it is made for such additional compensation; that is, he must show not only that Congress contemplated and provided for a service, and payment therefor, but that they contemplated and explicitly provided that if it should be rendered by one already entitled to a fixed compensation, he should nevertheless receive, in addition thereto, the compensation provided for such service. And the addition of such compensation to a fixed compensation is not to be inferred from any equitable considerations, but must be found explicitly declared in the law itself.
Such, in my judgment, is the fair interpretation of the language of this act; and the history of the legislation of Congress upon this subject of the extra compensation of officers makes this interpretation, if possible, still more plain and necessary.
The defendant relies on the following clause in the appropriation act of March 3, 1849, (9 Stat. at L., 367:) "For superintendents' *478 commissions, at two and one-half per cent. on the $466,930.08 appropriated above for light-house purposes, $11,673.25. And the proviso contained in the act making appropriation for the civil and diplomatic expenses of the Government, for the year ending the 30th day of June, 1849, and for other purposes, approved, &c., which proviso is in the following words: `Provided, that no part of the sum hereby appropriated shall be paid to any person who receives a salary as an officer of the customs; and from and after the 1st day of July, 1849, the said disbursement shall be made by the collectors of the customs without compensation, is hereby repealed.'"
The argument of the defendant's counsel is, that the express repeal of this proviso is equivalent to an explicit declaration that parts of the sum appropriated by this act might be paid to persons who received salaries as officers of the customs, and that it was not to be disbursed by collectors without compensation.
But, certainly, this appropriation does not "explicitly set forth that it is for additional pay, extra allowance, or compensation." If this appears at all, it is only inferentially; and the inquiry is, whether it be a necessary inference that some part of this sum was appropriated as additional pay or extra compensation to collectors who should perform the service of superintendents of lights.
Now, the proviso which was repealed consisted of two parts. The first related exclusively to commissions in the disbursement of the appropriation for light-house expenses made for the fiscal year ending on the 30th day of June, 1849; and it prohibited the payment of any commissions out of the sum thus appropriated, to any officer of the customs who received a salary.
The second part of the proviso positively required the service of making disbursements as superintendents of lights to be performed by collectors of customs, after July 1, 1849, without compensation. It left no discretion with the Secretary of the Treasury to appoint any other person to discharge this duty.
*479 The repeal of the proviso left the right of officers of the customs to participate in the commissions for disbursing the appropriation made for the year ending June 31, 1849, to stand upon the law as elsewhere found; and restored to the Secretary of the Treasury the power to appoint persons other than collectors to make the disbursements; and if collectors should be appointed, it left their right to commissions to depend on the law as elsewhere found.
It must be admitted that this repeal might, under some circumstances, indicate an intention to have collectors participate in these commissions. If they have been for the first time deprived of them by the proviso, its repeal would quite clearly show that their former title was restored. But the contrary is true. Independent of the proviso, they had no title to this or any other extra compensation, and, by force of the act of August 2, 1842, could have none, unless explicitly granted by the act making the appropriation; so that unless I can say that the repeal of the proviso either repeals the second section of the act of 1842, or satisfies its requirements by an explicit appropriation to pay an extra compensation for an extra service, the defendant has no title to the commission. That the second section of the act of 1842 is not repealed by implication, by the repeal of the proviso, is clear. There is no repugnance between this repeal and the act of 1842. The reasons for repealing the entire proviso may have been that the act of 1842 was broad enough to cover the cases of extra compensation contemplated by the proviso, and so it was not necessary, in so far as its object was to provide for those cases; and in so far as it required the service to be performed by collectors only, that it was inexpedient. But to amount to a compliance with the second section of the act of 1842, it should have superadded to the repeal of the proviso, an explicit declaration that the appropriation was intended as extra compensation to those officers, having fixed salaries, who might be selected to render the service.
There are two other views of this subject, either of which would, in my judgment, be sufficient to show that there is no lawful claim to these commissions.
*480 The first is, that although Mr. Greely was superintendent of lights within a certain district, extending round the Massachusetts Bay, yet these commissions are charged on disbursements made by him in the purchase, under the orders of the Secretary of the Treasury, of oil and some other materials for the whole light-house service of the United States. Now, the appropriation made is for "superintendents' commissions." If he did not render this service as superintendent, but, aside from that employment, acted under the orders of the Secretary of the Treasury in making large purchases for this service, no appropriation is made for paying him. It was, no doubt, an onerous and responsible duty, imposed upon him because he happened to be at a place favorable for making these purchases; and this may constitute a claim on the equitable consideration of Congress, especially if the imposition of this onerous duty on him, instead of distributing it among all or most of the superintendents of lights, was advantageous to the Government. But this is for the consideration of Congress. It does not enable me to say an appropriation to pay commissions by way of extra compensation was actually made.
Besides, if the repeal of the proviso in the act of 1848 were held to amount to an explicit declaration that collectors might participate in the commissions of superintendents, by way of extra compensation, the inquiry would still remain, To what extent may they receive such extra compensation? And this seems to me to be answered by the act of May 7, 1822, sec. 18, (3 Stat. at L., 696,) "That no collector, surveyor, or naval officer, shall ever receive more than four hundred dollars annually, exclusive of his compensation as collector, surveyor, or naval officer, and the fines and forfeitures allowed by law, for any services he may perform for the United States in any other office or capacity." In the case of Hoyt v. United States, (10 How., 141,) the Supreme Court considered this section in force, and applied it to the case of a collector who held office from March, 1838, to March, 1841, and I am not aware of its having been since repealed. It was admitted that, aside from the charge now in question, Mr. Greely had received extra compensation to the extent of four hundred dollars annually, for *481 services performed for the United States in a capacity other than that of collector. It follows, that for services performed in making these contracts and disbursements, which were not within his duties as collector, he can make no further charge.
What has thus far been said relates exclusively to the defendant's claims under the act of 1849. The subsequent acts are so much more unfavorable to these claims, that I do not deem it necessary to enter into a particular discussion of them. They are the acts of September 30, 1850, (9 Stat. at L., 533,) March 3, 1851, (9 Stat. at L., 608,) and August 31, 1852, (10 Stat. at L., 86.) I have examined these acts, and am satisfied each of them deprives every collector, whose compensation exceeds twenty-five hundred dollars, of all participation in these commissions, though they are required to render the service of superintendents of lights or disbursing agents in procuring supplies for them.